Roy ENDSLEY, Jr., and William T. Clifford, d/b/a Gemini Systems, Appellants (Defendants Below),

v.

GAME–SHOW PLACEMENTS, LTD., Appellee (Plaintiff Below).

No. 3–679A174.

Court of Appeals of Indiana, Third District.

March 26, 1980.

Robert D. Truitt, Lyons & Truitt, Valparaiso, for appellant Roy Endsley, Jr.

Duane W. Hartman, Thomas F. Macke, Blachly, Tabor, Bozik & Hartman, Valparaiso, for appellee.

STATON, Judge.

Game-Show Placements, Ltd. (Game-Show) filed an action for breach of contract against Roy Endsley, Jr. and William T. Clifford, d/b/a Gemini Systems (Gemini). On September 6, 1978, the court entered a default judgment against William Clifford in favor of Game-Show. On January 22, 1979, the court found Roy Endsley, Jr. to have been a general partner with Clifford in Gemini. It concluded that Endsley was liable for a partnership debt to Game-Show in the amount of $12,495.

On appeal, Endsley raises three issues for our consideration:

(1) Was the evidence sufficient to support the finding of the trial court that a partnership existed?

(2) Did the trial court err in applying the present partnership status retroactively to find the existence of a partnership as of December 7, 1977?

(3) Did the trial court err in its determination of damages?

We affirm.

The facts and the reasonable inferences to be drawn therefrom most favorable to the appellee indicate that on December 7, 1977, William Clifford, doing business as Gemini Systems, executed a contract with Game-Show Placements. Game-Show agreed to advertise Gemini projection television units on 15 network game show spots. Gemini contracted to pay a $195 per showing fee and to supply and ship the television systems to the designated winners. In addition, Gemini acknowledged Game-Show as its agent for entering agreements with television program production companies and networks. It also agreed to be bound by the terms and conditions contained in these agreements.

On January 5, 1978, Game-Show executed a contract with P.S. Promotions, Inc. for the advertisement of Gemini Systems on the television program "Nighttime Hollywood Squares." The Gemini advertisements appeared six times.[1] Each time, notice of the airing was sent to Gemini along with the name of the person to whom Gemini was to send a television.

In January of 1977, nearly a year before the execution of Gemini's contract with Game-Show, Endsley had given Clifford $6,000 as an investment in Gemini. In exchange for the $6,000, Endsley was entitled to 49 percent of the business proceeds. As an additional part of this agreement, he was relieved of the details of running the business.

I.

Sufficiency of Evidence

On appeal, Endsley argues that he was not a partner in Gemini and, therefore, should not be held liable on the $12,495 partnership debt. We disagree.

A partnership is defined by IC 1971, 23–4–1–6 (Burns Code Ed.):

---

1. The show's producer had scheduled 15 spots. At the time he was told to stop advertising the

Gemini televisions, six of those spots had already been committed to airing.

"A partnership is an association of two or more persons to carry on as co-owners a business for profit."

IC 1971, 23–4–1–7 sets forth the rules for determining the existence of a partnership:

"In determining whether a partnership exists, these rules shall apply:

"(1) Except as provided by section 16 [23–4–1–16] persons who are not partners as to each other are not partners as to third persons.

"(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.

"(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

"(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

"(a) As a debt by instalments or otherwise,

"(b) As wages of an employee or rent to a landlord,

"(c) As an annuity to a widow or representative of a deceased partner,

"(d) As interest on a loan, though the amount of payment vary with the profits of the business,

"(e) As the consideration for the sale of a good will of a business or other property by instalments or otherwise."

■ According to IC 1971, 23–4–1–7(4), "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business . . ." The record reveals that Endsley was entitled to a 49 percent share of the profits of Gemini Systems. This inference of partnership could have been rebutted by Endsley if he had shown this share had been received as a type of payment. See IC 1971, 23–4–1–7(4)(a–e). He failed to present any such evidence.

■ He argues, instead, that the applicable statute requires the *actual* receipt of money as profits in order for the inference of partnership to arise. Such a constrained reading of IC 1971, 23–4–1–7(4) is incorrect. This section clearly states that "[t]he receipt by a person of a *share* of the profits of a business is prima facie evidence that he is a partner in the business . . . ." (Emphasis supplied.). To read this section narrowly, as suggested by Endsley, would result in making the partnership statute inapplicable to all business ventures which fail before the profits are realized. His approach is untenable, especially in light of the potential involvement of unpaid third party creditors.

■ Endsley also argues that Game-Show must show that he agreed to share the losses as well as the profits before a partnership can be proven. Although such an agreement is, of course, relevant to the existence of a partnership, it is not essential. IC 1971, 23–4–1–7(4) establishes proof of profit-sharing alone as prima facie evidence of a partnership relation.

■ Much of the testimony bearing on the business arrangement in question is oral. Endsley denies the existence of a valid partnership agreement, while Game-Show urges that one existed. We note that there is little evidence as to Endsley's participation in the day-to-day operations of Gemini as found in *Puzich v. Pappas* (1974), 161 Ind.App. 191, 314 N.E.2d 795. According to Clifford, Endsley had never ordered any television components for Gemini and had never been consulted as to the daily running of the business. Gemini's books of account proved to be a checkbook with only Clifford as the authorized signatory. The company's business cards and stationery were devoid of indices of ownership. Neither Clifford nor Endsley placed their name on any Gemini advertising. Despite Endsley's contention, however, his lack of daily

involvement in Gemini is not per se indicative of the absence of a partnership.[2]

The record reveals that, initially, Endsley had little to do with the business affairs of Gemini. On November 10, 1977, however, he acted on behalf of Gemini and borrowed $10,000 from a doctor to be used as capital for its operations. In a document entitled Agreement, Endsley and Clifford represented themselves as "doing business as Gemini Systems." One clause in this agreement stated that the interest "will be computed on the basis of partnership return prepared and filed on behalf of Gemini Systems." [3] Both Endsley and Clifford signed the document. A promissory note, executed by Endsley and Clifford, was then drawn to the order of the doctor as evidence of the $10,000 given to Gemini.[4] On April 3, 1978, in his defense of an action upon this note, Endsley admitted, in writing, that he and Clifford operated Gemini and that they had invested the borrowed capital in the company.

Endsley further acted on behalf of Gemini when he discussed the company's lease with a local attorney. The attorney explained:

"Q. Can you tell me what you said and what Mr. Endsley said in the phone conversation of November 16, 1978?

\* \* \* \* \* \*

"A. At that time, Carmen Good and his father were owners of the building out there. There was a lease that was executed by Gemini Systems, I believe, is the way it was phrased and *it was our understanding that Mr. Endsley and others were involved in that and they had possession of the premise* and I was mak-

ing abandonment on payment of rent.

\* \* \* \* \* \*

A. Well, I was—I asked when we would expect payment and there was discussion concerning his responsibility—this is Mr. Endsley's—concerning responsibility of payment and there was some conversation about corporation for it that was not formed and Mr. Endsley was in the process of reorganizing and *he had hopes of paying off bills and that if we would give him time, once they got the reorganization production going, he thought they would be in a situation where it would be paid.*" (Emphasis supplied.).

In reviewing the evidence to determine its sufficiency, we may only look to that evidence and the reasonable inferences to be drawn therefrom most favorable to the appellee. *Butler v. Forker* (1966), 139 Ind.App. 602, 221 N.E.2d 570. This Court will neither weigh the evidence nor judge the credibility of the witnesses. *Butler, supra.* It is the province of the trial court to determine which witness to believe when it hears the evidence. *Jackman v. Jackman* (1973), 156 Ind.App. 27, 294 N.E.2d 620, 625. We cannot reverse upon the basis of conflicting evidence. *Franks v. Franks* (1975), 163 Ind.App. 346, 323 N.E.2d 678, 680. In order to reverse the finding of the trial court, the evidence must lead solely to a conclusion which is contrary to that reached by the lower court. *Butler, supra; Puzich, supra.* In viewing the evidence before us in the prescribed fashion, we find that it does not lead solely to a conclusion which is

---

2. On cross-examination, Clifford acknowledged that, according to their agreement, Endsley was relieved of worrying about the business. Endsley, however, was entitled to a share of the profits. The rights and duties of the partners in relationship to the partnership may be determined by an agreement between them. *Butler v. Forker* (1966), 139 Ind.App. 602, 221 N.E.2d 570.

3. Game-Show is not attempting to argue that Endsley is a partner by estoppel, see IC 1971,

23–4–1–16. Rather, it seeks to show that these admissions and documentary evidence tend to indicate a pattern of partnership in various transactions.

4. Clifford also testified that he and Endsley had signed a note with First National Bank. This note, he explained, was executed "sometime in '77" as a "personal loan" to "Roy Endsley and myself."

contrary to that reached by the trial court. We, therefore, must agree with the court's conclusion that Endsley was a partner with Clifford in Gemini.

## II.

### Retroactive Partnership

■ Endsley claims that "The court used, in large part, the present business relationship of Endsley and Clifford as partners of Good Times, Inc. to find that there was a partnership existing" on the date of the Game-Show contract. This is simply not the case. Not only is there a total lack of proof as to this charge, but there is ample evidence to support the finding of partnership on the date in question as well.

We note that Endsley and Clifford are currently involved in a television projection company, Good Times, Inc. This, by Endsley's own admission, is a corporation, not a partnership. The trial court could not have retroactively applied a "present partnership relationship" when such does not exist. We will not discuss Endsley's unsubstantiated contention any further.

### III.

### Damages

Pursuant to the contract in which Gemini agreed to pay Game-Show a $195 per showing fee for 15 network game show spots, Endsley tacitly acknowledges the compensation due Game-Show is $2,925. He, however, argues that the damages, imposed by the court, were excessive. He claims that the contract, signed by Gemini, did not specify that a television projection system was to be awarded for each and every time that a Gemini promotion was televised. His contention is correct. He, however, neglects to mention two very crucial provisions in this same contract. Gemini expressly acknowledged Game-Show as its agent for the purpose of entering into agreements with television production companies, such as P.S. Promotions. Gemini also expressly agreed to be bound by the terms and conditions contained in any agreement entered pursuant to this agency. The pertinent provision is as follows:

"3. Client acknowledges that Game-Show Placements, Ltd. is hereby appointed as client's agent to enter into agreement(s) with television program production companies and/or network(s) with respect to participation hereunder, and client agrees to be bound by the terms and conditions contained in any agreement entered into pursuant to this agency. Any such agreement shall be deemed incorporated in full into this contract and shall supercede the terms hereof. . . ."

Game-Show, acting as an agent for Gemini, executed a contract with P.S Promotions, Inc. for the advertisement of the Gemini television system on "Nighttime Hollywood Squares." The contract provided, in part:

"This letter will constitute an agreement between you (acting as agent for your client)

GEMINI SYSTEMS

and P.S. Promotions, Inc., relating to your participation on the television program

NIGHTTIME HOLLYWOOD SQUARES .

It is agreed that you will make available to the above named program as a prize, to the winning contestants, the following product or service ('Merchandise'):

GEMINI VIDEO PROJECTION CONSOLE (II)

"P.S. Promotions, Inc. will notify you of prize recipients and their addresses. You will arrange for

PREPAID INSIDE DELIVERY

of the exact Merchandise described herein to the recipient as soon as possible, but in no event later than 60 days after we notify you of the prize recipients.

\*      \*      \*      \*      \*      \*

"If the Merchandise herein is not awarded on the program where its identification is broadcast, it may be awarded with or without another identification in con-

nection with the same program to a contestant, guest participant, special audience guest or group, as a door prize."

A fair reading of these provisions indicates that a Gemini system was contemplated as compensation each time its identification was broadcast. The contract further stated that if the merchandise was not won or awarded on the show, it could be awarded later to a contestant, guest participant, special audience guest or group, as a door prize. This interpretation was buttressed by the testimony of one of the officers of Game-Show when he explained his company's payment policies. He stated that the compensation for Game-Show's services in seeking advertisements on network game shows is comprised of a general fee plus the product advertised. He testified:

"A. Well, in a case of an expensive item, like the television, $195. If it's packaged products, something like grocery items or cosmetics, drug items and so on, it would be as much as $1,750 on a show like Hollywood Squares Nighttime.

"Q. In addition, what happens to the product itself?

"A. The product is considered part of the trade agreement.

In other words, the value of the product is taken into account in considering the value of that spot. $1,595 television plus $195 fee is what they are paying; combination of product and fee for that exposure."

Because this contract was executed by Game-Show, within the scope of its authority as agent, Gemini is bound by the terms. *See Thompson Farms v. Corno Feed Products, Etc.* (1977), Ind.App., 366 N.E.2d 3. By virtue of this agency relationship, we conclude that Gemini is liable to Game-Show in the amount of $12,495, the value of six Gemini television systems and the $2,925 service fee.

Endsley argues that, even if he is obligated to compensate Game-Show for six television systems, the judgment should be reduced to reflect a mitigation of damages. He points out that, upon Gemini's breach of contract, Game-Show had negotiated with several contestants who were to have received Gemini sets. He claims that, in attempting to discharge these claims, the damages were mitigated by Game-Show in the amount of $1,490.

Mitigation of damages is a matter of defense, the burden of which is on the party held liable to respond in damages. *Jones v. Abriani* (1976), Ind.App., 350 N.E.2d 635; *Hirsch v. Merchants National Bank* (1975), 166 Ind.App. 497, 336 N.E.2d 833. The evidence as to whether the damages were satisfactorily mitigated is in conflict. The court apparently decided Endsley had not met his burden of proof on this issue when it found him liable for the full price of the six Gemini systems. We will not invade the province of the finder of fact and weigh the evidence. This is not our function.

Affirmed.

GARRARD, P. J., and HOFFMAN, J., concur.