**Paul Eugene VOHLAND, Defendant-Appellant,**

v.

**Norman E. SWEET, Plaintiff-Appellee.**

No. 1–181A5.

Court of Appeals of Indiana, First District.

April 20, 1982.

Rehearing Denied June 2, 1982.

**861**

Phillips B. Johnson, Johnson, Eaton & Taylor, Versailles, Richard H. Garvey, Rolfes, Garvey, Walker & Robbins, Greensburg, for defendant-appellant.

C. Jack Clarkson, John O. Worth, Clarkson & Worth, Rushville, for plaintiff-appellee.

NEAL, Judge.

Plaintiff-appellee Norman E. Sweet (Sweet) brought an action for dissolution of an alleged partnership and for an accounting in the Ripley Circuit Court against defendant-appellant Paul Eugene Vohland (Vohland). From a judgment in favor of Sweet in the amount of $58,733, Vohland appeals.

We affirm.

### STATEMENT OF THE FACTS

The undisputed facts reveal that Sweet, as a youngster, commenced working in 1956 for Charles Vohland, father of Paul Eugene Vohland, as an hourly employee in a nursery operated by Charles Vohland and known as Clarksburg Dahlia Gardens. Upon the completion of his military service, which was performed from 1958 to 1960, he resumed his former employment. In approximately 1963 Charles Vohland retired, and Vohland commenced what became known as Vohland's Nursery, the business of which was landscape gardening. At that time Sweet's status changed. He was to receive a 20 percent share of the net profit of the enterprise after all of the expenses were paid. Expenses included labor, gasoline, insurance, burlap, nails, insecticide, fertilizer, seed, straw, plants, stock and seedlings, and any other expense. The compensation was paid on an irregular basis. Every week, two weeks, or perhaps even a month, Sweet and Vohland sat down and computed all income that had been received and all expenses that had been incurred since the last settlement. After the expenses had been deducted from the income, Sweet would receive a check for 20 percent

of the balance. Occasionally Sweet would receive an advance draw which would be deducted from his next settlement. No Social Security or income tax was withheld from the checks.

No partnership income tax returns were filed. Vohland and his wife, Gwenalda, filed a joint return in which the business of Vohland's Nursery was reported in Vohland's name on Schedule C. Money paid Sweet was listed as a business expense under "Commissions." Also listed on Schedule C were all of the expenses of the nursery, including investment credit and depreciation on trucks, tractors, and machinery. Sweet's tax returns declared that he was a self-employed salesman at Vohland's Nursery. He filed a self-employment Schedule C and listed as income the income received from the nursery; as expenses he listed travel, advertising, phone, conventions, automobile, and trade journals. He further filed a Schedule C–3 for self-employment Social Security for the receipts from the nursery.

Vohland handled all of the finances and books and did most of the sales. He borrowed money from the bank solely in his own name for business purposes, including the purchase of the interests of his brothers and sisters in his father's business, operating expenses, bid bonds, motor vehicles, taxes, and purchases of real estate. Sweet was not involved in those loans. Sweet managed the physical aspects of the nursery and supervised the care of the nursery stock and the performance of the contracts for customers. Vohland was quoted by one customer as saying Sweet was running things and the customer would have to see Sweet about some problem.

Evidence was contradictory in certain respects. The Vohland Nursery was located on approximately 13 acres of land owned by Charles Vohland. Sweet testified that at the commencement of the arrangement with Vohland in 1963, Charles Vohland grew the stock and maintained the inventory, for which he received 25 percent of the gross sales. In the late 1960's, because of age, Charles Vohland could no longer perform. The nursery stock became depleted to nearly nothing, and new arrangements were made. An extensive program was initiated by Sweet and Vohland to replenish and enlarge the inventory of nursery stock; this program continued until February, 1979. The cost of planting and maintaining the nursery stock was assigned to expenses before Sweet received his 20 percent. The nursery stock generally took up to ten years to mature for market. Sweet testified that at the termination of the arrangement there existed $293,665 in inventory which had been purchased with the earnings of the business. Of that amount $284,860 was growing nursery stock. Vohland, on the other hand, testified that the inventory of 1963 was as large as that of 1979, but the inventory became depleted in 1969. Vohland claimed that as part of his agreement with Charles Vohland he was required to replenish the nursery stock as it was sold, and in addition pay Charles Vohland 25 percent of the net profit from the operation. He contends that the inventory of nursery stock balanced out. However, Vohland conceded on cross-examination that the acquisition and enlargement of the existing inventory of nursery stock was paid for with earnings and, therefore, was financed partly with Sweet's money. He further stated that the consequences of this financial arrangement never entered his mind at the time.

Sweet's testimony, denied by Vohland, disclosed that, in a conversation in the early 1970's regarding the purchase of inventory out of earnings, Vohland promised to take care of Sweet. Vohland acknowledged that Sweet refused to permit his 20 percent to be charged with the cost of a truck unless his name was on the title. Sweet testified that at the outset of the arrangement Vohland told him, "he was going to take ... me in and that ... I wouldn't have to punch a time clock anymore, that I would be on a commission basis and that I would be, have more of an interest in the business if I had 'an interest in the business.' ... He referred to it as a piece of the action." Sweet testified that he intended to enter into a partnership. Vohland asserts that no

partnership was intended and that Sweet was merely an employee, working on a commission. There was no contention that Sweet made any contribution to capital, nor did he claim any interest in the real estate, machinery, or motor vehicles. The parties had never discussed losses.

After Charles Vohland died (in 1973) Vohland contends that he paid $1,000 a year to Mary Crystal Vohland, his stepmother and current owner of the 13 acres, as a gift, and in addition replenished the nursery stock as it was taken and sold. Sweet contends the payments were a flat fee for the use of the land.

## ISSUES

Vohland presents four issues for review:

I. Was the evidence sufficient to support the finding of the trial court that Sweet had a 20 percent interest in the inventory of the landscaping business?

II. Was the evidence sufficient to support the finding of the trial court that Vohland failed to advise Sweet that trees, materials, and supplies were costs of doing business and that "net" was the amount left after such costs had been paid in full?

III. Was the evidence sufficient to support the finding of the trial court that Vohland and Sweet had an inventory with a value of $293,665?

IV. Was the evidence sufficient to support the conclusion of law of the trial court that the business relationship of the parties, Vohland and Sweet, was a partnership?

## DISCUSSION AND DECISION

*Issues I, II and IV. Existence of partnership*

The principal point of disagreement between Sweet and Vohland is whether the arrangement between them created a partnership, or a contract of employment of Sweet by Vohland as a salesman on commission. It therefore becomes necessary to review briefly the principles governing the establishment of partnerships.

It has been said that an accurate and comprehensive definition of a partnership has not been stated; that the lines of demarcation which distinguish a partnership from other joint interests on one hand and from agency on the other, are so fine as to render approximate rather than exhaustive any attempt to define the relationship. *Bacon v. Christian*, (1916) 184 Ind. 517, 111 N.E. 628.

A partnership is defined by Ind.Code 23–4–1–6(1) (Uniform Partnership Act of 1949):

"A partnership is an association of two or more persons to carry on as co-owners a business for profit."

Ind.Code 23–4–1–7 sets forth the rules for determining the existence of a partnership:

"In determining whether a partnership exists, these rules shall apply:

(1) Except as provided by section 16 persons who are not partners as to each other are not partners as to third persons.

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As a debt by instalments or otherwise,

(b) As wages of an employee or rent to a landlord,

(c) As an annuity to a widow or representative of a deceased partner,

(d) As interest on a loan though the amount of payment vary with the profits of the business,

(e) As the consideration for the sale of a good will of a business or other property by instalments or otherwise."

 Under Ind.Code 23–4–1–7(4) receipt by a person of a share of the profits is *prima facie* evidence that he is a partner in the business. *Endsley v. Game-Show Placements, Ltd.,* (1980) Ind.App., 401 N.E.2d 768. Lack of daily involvement for one partner is not per se indicative of absence of a partnership. *Endsley, supra.* A partnership may be formed by the furnishing of skill and labor by others. The contribution of labor and skill by one of the partners may be as great a contribution to the common enterprise as property or money. *Watson v. Watson,* (1952) 231 Ind. 385, 108 N.E.2d 893. It is an established common law principle that a partnership can commence only by the voluntary contract of the parties. *Bond v. May,* (1906) 38 Ind.App. 396, 78 N.E. 260. In *Bond* it was said, "[t]o be a partner, one must have an interest with another in the profits of a business, as profits. There must be a voluntary contract to carry on a business with intention of the parties to share the profits as common owners thereof." *Id.,* 38 Ind.App. at 402, 78 N.E. 260. In *Bacon, supra,* in reviewing the law relative to the creation of partnerships, the court said:

"From these, and other expressions of similar import, it is apparent to establish the partnership relation, as between the parties, there must be (1) a voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor or skill in a common enterprise; and (2) an intention on the part of the principals to form a partnership for that purpose. But it must be borne in mind, however, that the intent, the existence of which is deemed essential, is an intent to do those things which constitute a partnership. Hence, if such an intent exists, the parties will be partners notwithstanding that they proposed to avoid the liability attaching to partners or [have] even

expressly stipulated in their agreement that they were not to become partners. [Citation omitted]

It is the substance, and not the name of the arrangement between them, which determines their legal relation toward each other, and if, from a consideration of all the facts and circumstances, it appears that the parties intended, between themselves, that there should be a community of interest of both the property and profits of a common business or venture, the law treats it as their intention to become partners, in the absence of other controlling facts."

*Id.* 184 Ind. at 521–522, 111 N.E. 628.

*Watson, supra,* has substantial similarities to the case at bar, and the reader should study it. Briefly, the facts disclose that in a suit for the dissolution of a partnership and an accounting, Mary Watson commenced to work on a farm, and thereafter, in 1945, she assumed the management thereof. She made no capital contributions, and there was no specific agreement, oral or written. At the commencement, the farm and certain machinery and livestock were owned by Keller. From the proceeds of the sale of grain, livestock, and produce, new and additional machinery was purchased, and the herds of livestock were increased. Debts on old machinery were retired. Separate income tax returns were filed reflecting that, in approximate terms, Mary Watson received one fourth, Elizabeth Watson one fourth, and Keller one half the net income of the farming operation. The court, citing *Bacon, supra,* affirmed the trial court's money judgment in favor of Mary Watson for a portion of the increase of the machinery and livestock herds. The court stated:

"The facts and circumstances in this case are such that the court might readily conclude therefrom that Alice C. Keller, Elizabeth Watson and Mary E. Watson 'intended, between themselves, that there should be a community of interest' in any increment in the value of the capital and in the profits of their common venture in the operation of the Keller Farm. We

find no controlling facts to the contrary, and under these circumstances the law will presume that they intended to form a partnership. [Citations omitted]

\* \* \* \* \* \*

We believe the evidence here presents a state of facts from which the trial court could legally infer the establishment of a partnership with appellee having a one-fourth interest, appellant, Elizabeth Watson, a one-fourth interest, and appellant, Alice C. Keller, a one-half interest."

*Watson*, 231 Ind. 391–393, 108 N.E.2d 893. The *Watson* court struck down the argument made in the case at bar that Mary Watson made no capital contribution, stating that a partner may contribute skill and labor in lieu of capital. The court rested its decision on the grounds that Mary received no salary or wages for her services, and her sole income was from one fourth of the net profits arising from the operation of the farm.

■ The standard of review for a case such as this was stated in *Endsley, supra.*

"In reviewing the evidence to determine its sufficiency, we may only look to that evidence and the reasonable inferences to be drawn therefrom most favorable to the appellee. *Butler v. Forker* (1966), 139 Ind.App. 602, 221 N.E.2d 570. This Court will neither weigh the evidence nor judge the credibility of the witnesses. *Butler, supra.* It is the province of the trial court to determine which witness to believe when it hears the evidence. *Jackman v. Jackman* (1973), 156 Ind.App. 27, 294 N.E.2d 620, 625. We cannot reverse upon the basis of conflicting evidence. *Franks v. Franks* (1975), 163 Ind.App. 346, 323 N.E.2d 678, 680. In order to reverse the finding of the trial court, the evidence must lead solely to a conclusion which is contrary to that reached by the lower court. *Butler, supra; Puzich, supra.* In viewing the evidence before us in the prescribed fashion, we find that it does not lead solely to a conclusion which is contrary to that reached ʰy the trial court."

*Id.* 401 N.E.2d at 771–772. In the analysis of the facts, we are first constrained to observe that should an accrual method of accounting have been employed here, the enhancement of the inventory of nursery stock would have been reflected as profit, a point which Vohland, in effect, concedes. We further note that both parties referred to the 20 percent as "commissions." To us the term "commission," unless defined, does not mean the same thing as a share of the net profits. However, this term, when used by landscape gardeners and not lawyers, should not be restricted to its technical definition. "Commission" was used to refer to Sweet's share of the profits, and the receipt of a share of the profits is *prima facie* evidence of a partnership. Though evidence is conflicting, there is evidence that the payments were not wages, but a share of the profit of a partnership. As in *Watson, supra*, it can readily be inferred from the evidence most favorable to support the judgment that the parties intended a community of interest in any increment in the value of the capital and in the profit. As shown in *Watson*, absence of contribution to capital is not controlling, and contribution of labor and skill will suffice. There is evidence from which it can be inferred that the parties intended to do the things which amount to the formation of a partnership, regardless of how they may later characterize the relationship. *Bacon, supra.* From the evidence the court could find that part of the operating profits of the business, of which Sweet was entitled to 20 percent, were put back into it in the form of inventory of nursery stock. In the authorities cited above it seems the central factor in determining the existence of a partnership is a division of profits.

From all the circumstances we cannot say that the court erred in finding the existence of a partnership.

*Issue III. Excessive judgment*

Vohland argues that the evidence is insufficient to support a finding that the value of the inventory was \$293,665. The court's award to Sweet was 20 percent of this amount. Vohland argues that the fig-

ure testified to by Sweet included $284,860 in nursery stock growing on land owned by Mary Crystal Vohland, and this stock was therefore her property. However, the evidence is clear that some sort of lease arrangement was involved wherein Mary Crystal Vohland was paid and the stock could be removed without her prior consent. Vohland cites no authority to support his contention, nor does he develop any cogent argument as to why nursery stock planted on leased premises are not *fructus industriales*.

Generally, *fructus industriales*, such as growing crops, are considered to be personal property and are not a part of the real estate. *Niagara Oil Company v. Ogle*, (1912) 177 Ind. 292, 98 N.E. 60; *Perry v. Hamilton*, (1893) 138 Ind. 271, 35 N.E. 836; *Richardson v. Scroggham*, (1974) 159 Ind. App. 400, 307 N.E.2d 80; 9 I.L.E. *Crops* § 2. However Vohland makes a bare assertion unsupported by authority that insomuch as Mary Crystal Vohland owned the real estate, neither he nor Sweet had any interest whatever in the nursery stock planted there at the admitted expense of Sweet and Vohland. We hold that Vohland has not complied with Ind. Rules of Procedure, Appellate Rule 8.3(A)(7) by presenting citations of authorities and cogent argument, and has waived that issue. *Krueger v. Bailey*, (1980) Ind.App., 406 N.E.2d 665; *American Optical Company v. Weidenhamer*, (1980) Ind.App., 404 N.E.2d 606; *Nationwide Mutual Insurance Company v. Pomeroy*, (1967) 141 Ind.App. 288, 227 N.E.2d 448.

For the above reasons this cause is affirmed.

Affirmed.

RATLIFF, P. J., and ROBERTSON, J., concur.