WESTERN ASSURANCE COMPANY, INC., Plaintiff and Counterclaim Defendant,

v.

J.D. CONNORS; Linda H. Connors, Connors Consulting Group, Inc.; J.D. Connors, Linda H. Connors, and/or Connors Consulting Group, Inc., d/b/a Western Assurance Co. of Indiana; J.D. Connors, Linda H. Connors, Connors Consulting Group, Inc., and/or Western Assurance, Co. of Indiana, d/b/a Western Assurance Company, Security Bank, Defendants,

and

CONNORS CONSULTING GROUP, INC., Counterclaimant and Third–Party Plaintiff,

v.

Martin NEMETH, Third-party Defendant.

No. IP 88–1245–C.

United States District Court, S.D. Indiana, Indianapolis Division.

July 2, 1993.

Edward S. Adams, Hall & Adams, Indianapolis, IN, for plaintiff.

Malcolm Mallette, Krieg DeVault Alexander & Capehart, David O. Campbell, Bingham Summers Welsh & Spilman, Indianapolis, IN, for defendants.

Martin C. Nemeth, pro se.

### ENTRY

BARKER, District Judge.

From 1981 to 1988, J.D. Connors ("Connors") and the Connors Consulting Group, Inc. ("CCG"), and Martin Nemeth ("Nemeth") and the Western Assurance Company, Inc. ("Western Assurance") reaped a small fortune working together. Unfortunately for these parties, however, they were in such a hurry to make money that they failed to specify exactly what their responsibilities were one to the other, or to exercise financial control over their newly acquired wealth. Because of their inattention to legal form and aversion to reducing their thoughts to writing, they now dispute matters which are elementary to their business's organization; specifically, the parties want the Court to decide whether Connors was an employee of Western Assurance who was entitled to twenty percent (20%) of the profits from FICA recovery and other projects, or whether he was a partner or joint adventurer, along with CCG, in a separate business with Nemeth and Western Assurance who was entitled to fifty percent (50%) of the profits and to deposit Western Assurance checks into the accounts of CCG.

The Plaintiff's Second Amended Complaint alleges breach of contract as to Connors, and conversion, theft, deception, and forgery as to Connors, Linda H. Connors ("Linda Connors"), and CCG. CCG's Counterclaim against Western Assurance and Third–Party Complaint against Nemeth allege breach of contract. CCG's request for an accounting of Western Assurance's income and the appointment of a receiver to oversee Western Assurance's property is moot. An accounting has already been completed by a special master, and Western Assurance is presently in bankruptcy. The Court also created an escrow account to safeguard the assets of Western Assurance until the completion of this litigation.

A bench trial was conducted on June, 10th, 11th and 12th, 1992, and February 17th, 18th, and 19th, 1993. Having heard and considered the evidence, the Court hereby denies all claims in the Second Amended Complaint, Counterclaim, and Third–Party Complaint. The Court, accordingly, enters the following findings of fact and conclusions of law.

### Findings Of Fact

1. Plaintiff Western Assurance Company, Inc. was a corporation organized under the laws of the State of California, having its principal place of business in the State of California.

2. Defendants J.D. Connors and Linda H. Connors are citizens of the State of Indiana. Defendant and Third–Party Plaintiff Connors Consulting Group, Inc. is a corporation organized under the laws of the State of Indiana, having its principal place of business in Elwood, Indiana, and having registered and assumed business names of Midwestern Assurance Company, Inc. ("Midwestern") and

Western Assurance Company of Indiana ("WAI").

3. Third–Party Defendant Martin Nemeth is a citizen of the State of California.

4. The amount in controversy in this action is in excess of $50,000 exclusive of interest and costs.

5. Western Assurance was formed in 1979 in the State of California. At all times relevant to this litigation, Nemeth was the sole shareholder of Western.

6. CCG was formed in the State of Indiana in 1981. Since 1982, Connors has been the sole shareholder of CCG.

7. Prior to starting his FICA recovery business in 1979, Nemeth was employed as a relief pharmacist.

8. Prior to forming his consulting business, Connors was employed in a hardware store, which was owned by a relative.

9. Prior to assisting with the FICA recovery program, Linda Connors was receiving unemployment compensation. She had worked as a secretary before being laid off in 1983.

10. The Court affords little credibility to the testimony of Nemeth, Connors, and Linda Connors.

11. The financial dealings of Connors, CCG, Nemeth, and Western Assurance were chaotic. The Court has a hard time even applying the term "business" to the transactions which took place between these parties, as it implies a degree of organization, planning, and decorum which was lacking in almost every instance. The large cash flows which their work generated overwhelmed their limited managerial expertise. The result was inevitable: a feud between unsophisticated parties who were foolish enough to embark on a complex business endeavor without the benefit of professional guidance; once lost, they turned on each other.

12. In December, 1981, and January, 1982, Nemeth and Connors discussed the prospect of organizing a project for the State of Indiana which involved the recovery of overpayments of FICA taxes made to the Social Security Administration. At that time, the laws of the United States did not require employers to pay Social Security taxes on an employee's sick pay. Many private and state employers were unaware of this fact and had mistakenly paid the tax. Both Nemeth and Connors had been involved in other FICA recovery projects involving private entities through their various business affiliations.

13. Nemeth travelled to Indiana in April, 1982 to discuss the possibility of working with Connors and CCG on the recovery of overpayments of FICA tax obligations for the State of Indiana.

14. In December, 1982, Connors signed a FICA recovery contract with the State of Indiana using the title "Vice–President of Western Assurance." *See* Plaintiff's Exhibit 73.

15. Connors frequently used the title Vice–President of Western Assurance or Senior Vice–President of Western Assurance. *See, e.g.,* Plaintiff's Exhibit 76.

16. The contract for the State of Indiana was held in the name of Western Assurance, and most of the expenses of the Indiana FICA recovery project were paid by Western Assurance. CCG, however, assisted in the project by contributing office equipment, material and the services of Connors and Linda Connors.

17. Western Assurance opened bank accounts at Security Bank in Elwood, Indiana. The signature card and corporate resolutions of Western Assurance, executed by Nemeth, as CEO of Western Assurance, and delivered in conjunction with the opening of these accounts, authorized Connors and Linda Connors to cash checks made payable to Western Assurance or to deposit checks made payable to Western Assurance in any account of Western Assurance. *See* Defendant's Exhibit 26.

18. Connors, CCG, Nemeth, and Western Assurance collaborated on numerous FICA recovery projects. They agreed to contribute services, funds, and goods to these projects, and Connors and Linda Connors allowed individuals who were working on FICA projects to stay at their home for free.

19. In addition to the FICA recovery program, Connors, CCG, Nemeth, and Western Assurance collaborated on a project to recover uncollected charges for hospital clients. This project came to be known as the "hospital recovery program."

20. The parties' frequently paid each other's expenses. For example, in 1984, Midwestern, a d/b/a of CCG, began paying auditors working on contracts held by Western Assurance from Midwestern's payroll. Earlier, Nemeth had advised Connors to deposit the FICA recovery commissions in whatever account the money was needed. The parties also were extremely lax about what expenses were incurred. Nemeth, for example, paid his wife a lump-sum cash payment of $40,000 as a "salary" in 1983. The evidence indicated, however, that the amount he decided to pay his wife was discretionary, as was the timing of the payment.

21. The parties contemplated that their business activities would encompass more than a single transaction.

22. There is no credible evidence establishing the existence of a joint venture or partnership agreement, written or implied, between Connors, CCG, Nemeth, and Western Assurance, according to the terms presented by any of the parties.

23. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Rules for determining the existence of a partnership.**—In determining whether a partnership exists, these rules shall apply:

. . . .

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

. . . .

(b) As wages of an employee or rent to a landlord.

. . . .

Ind.Code § 23–4–1–7 (Burns 1992).

24. Connors, CCG, Nemeth, and Western Assurance received a share of the profits from business projects on which they collaborated. *See, e.g.,* Defendant's Exhibits 39C, 39D.

25. The Court finds no credible evidence that Connors received compensation in the form of wages as an employee of Western Assurance.

26. The Court finds no credible evidence which establishes the existence of an agreement between Connors, CCG, Nemeth, and Western Assurance concerning the compensation Connors was to receive for his work on the FICA recovery or other projects.

27. The Court finds no credible evidence indicating that an agreement existed between Connors, CCG, Nemeth, and Western Assurance to the effect that Connors and CCG would receive a portion of the revenues from Western Assurance's project for Electronic Data Services ("EDS").

28. The Court finds no credible evidence which establishes that Connors, CCG, Nemeth, and Western Assurance agreed in 1983 to a particular percentage split of the profits from hospital recovery projects.

29. The Court finds no credible evidence which establishes that Connors, CCG, Nemeth, and Western Assurance agreed to a particular percentage split of the profits from projects which resulted from marketing efforts targeted at the Indiana Hospital Association ("IHA").

30. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Nature of partner's liability.**—All partners are liable; (a) Jointly and severally for everything chargeable to the partnership under section 13 and 14 [IC 23–4–1–13 and 23–4–1–14] of this chapter. (b) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

Ind.Code § 23–4–1–15.

31. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Causes of dissolution.**—Dissolution is caused:

(1) Without violation of the agreement between the partners:

. . . .

(b) By the express will of any partner when no definite term or particular undertaking is specified. . . .

Ind.Code § 23-4-1-31 (Burns 1992).

32. In January, 1985, Connors advised Nemeth that he would no longer work on any new projects with him or Western Assurance but would only complete outstanding matters. *See* Defendant's Exhibit 309. On January 1, 1985, all but one employee of Western Assurance at Elwood was transferred to the payroll of CCG. The remaining employee was transferred to CCG's payroll on June 1, 1985.

33. Western Assurance's bank accounts at Security Bank were closed in 1985.

34. Connors and CCG ended their business relationship with Nemeth and Western Assurance in March, 1988. At that time, Connors sent a proposed accounting to Nemeth which he rejected. *See* Defendant's Exhibit 62. Nemeth accused Connors of forgery and theft.

35. The Court appointed a Special Master, Deloitte & Touche, to furnish an accounting with respect to the FICA related cash receipts and cash disbursements of Western Assurance, CCG, and related companies for the years ending June 30, 1983, 1984, 1985, 1986, 1987, 1988, and July 1, 1988 to March 31, 1989.

36. The Special Master filed its report with the Court on June 30, 1990.

37. Western Assurance has been placed in bankruptcy. *See* United States Bankruptcy Court for the Central District of California, Cause No. SB91-16145 MG.

38. The Court finds no credible evidence which establishes that Connors breached a contractual duty owed to Western Assurance.

39. The Court finds no credible evidence which establishes that Western Assurance breached a contractual duty owed to CCG.

40. The Court finds no credible evidence which establishes that Nemeth breached a contractual duty owed to CCG.

41. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Theft—Receiving stolen property.**—(a) A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony. However, the offense is a Class C felony if the fair market value of the property is at least one hundred thousand dollars ($100,-000).

(b) A person who knowingly or intentionally receives, retains, or disposes of the property of another person that has been the subject of theft commits receiving stolen property, a Class D felony. However, the offense is a Class C felony if the fair market value of the property is at least one hundred thousand dollars ($100,000).

Ind.Code § 35-43-4-2 (Burns Supp.1992).

42. The Court finds no credible evidence that Connors, CCG, or Linda Connors committed theft as defined in Ind.Code § 35-43-4-2.

43. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Criminal Conversion.**—A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a class A misdemeanor.

Ind.Code § 35-43-4-3 (Burns 1985).

44. The Court finds no credible evidence that Connors, CCG, or Linda Connors committed criminal conversion as defined in Ind. Code § 35-43-4-3.

45. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

**Forgery.**—A person who, with intent to defraud, makes or utters a written instrument in such a manner that it purports to have been made:

(1) By another person;

(2) At another time;

(3) With different provisions; or

**1196**

(4) By authority of one who did not give authority; commits forgery, a class C felony.

Ind.Code § 35–43–5–2 (Burns 1985).

46. The Court finds no credible evidence that Connors, CCG, or Linda Connors committed forgery as defined in Ind.Code § 35–43–5–2.

47. There was in effect at all times relevant to this dispute, an Indiana statute which provides:

Deception.—(a) A person who:

. . . .

(2) Knowingly or intentionally makes a false or misleading written statement with intent to obtain property.... commits deception, a Class A misdemeanor.

Ind.Code § 35–43–5–3 (Burns Supp.1992).

48. The Court finds no credible evidence that Connors, CCG, or Linda Connors committed deception as defined in Ind.Code § 35–43–5–3.

49. Any finding of fact which is actually a conclusion of law shall be treated as a conclusion of law and incorporated into the conclusions of law which follow.

*Conclusions of Law*

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

2. The Court has personal jurisdiction over the parties.

3. Pursuant to 28 U.S.C. 1391(a), venue in this action is proper in the Southern District of Indiana.

■■■ 4. A joint venture contemplates only a single business transaction; a partnership is formed for general business of a particular kind. *See Boyer v. First National Bank of Kokomo,* 476 N.E.2d 895, 898 (Ind. App. 4 Dist.1985).

5. There was no joint venture between Connors, CCG, Nemeth, and Western Assurance.

■■■ 6. To establish a prima facie case of partnership, it must be shown that a written partnership agreement exists, or that there was an implied agreement, or a periodic sharing of profits. *See Trojnar v. Bihlman,* 136 Ind.App. 263, 200 N.E.2d 227, 228 (2 Dist.1964).

■■■ 7. A partnership may be formed by the furnishing of skill and labor by others; the contribution of labor and skill by one of the partners may be as great a contribution to the common enterprise as property or money. *See Vohland v. Sweet,* 433 N.E.2d 860, 864 (Ind.App. 1st Dist.1982).

■■■ 8. An agreement to share losses is not essential to the existence of a partnership. *See Endsley v. Game–Show Placemats,* 401 N.E.2d 768, 770 (Ind.App. 3 Dist. 1980).

9. Connors was not an employee of Western Assurance who was compensated for his services with wages.

■■■ 10. There was no joint venture or partnership agreement between Connors, CCG, Nemeth, and Western Assurance according to the terms stated by any of the parties. A partnership existed between Connors, CCG, Nemeth, and Western Assurance, however, by virtue of Ind.Code § 23–4–1–7 (Burns 1992); the scope of their business included only those projects on which they collaborated by individually contributing services, funds, or goods.

11. There was no agreement between Connors, CCG, Nemeth, and Western Assurance as concerns the compensation Connors was to receive for his work on the FICA recovery projects.

12. There was no agreement between Connors, CCG, Nemeth, and Western Assurance to the effect that Connors and CCG would receive a portion of the revenues from Western Assurance's EDS project.

13. There was no agreement between Connors, CCG, Nemeth, and Western Assurance in 1983 regarding a particular percentage split of the profits from the hospital recovery program.

14. There was no agreement between Connors, CCG, Nemeth, and Western Assurance regarding a particular percentage split

of the profits which resulted from marketing efforts targeted at the IHA.

■ 15. Connors and CCG are entitled to one-half of the profits from all projects on which they collaborated with Nemeth and Western Assurance by contributing services, funds, or goods.

■ 16. The partnership between Connors, CCG, Nemeth and Western Assurance dissolved in March, 1988.

■ 17. Connors, CCG, Nemeth, and Western Assurance are jointly and severally liable for all debts and obligations of the business projects on which they collaborated.

18. Connors breached no contractual duty owed to Western Assurance.

19. Western Assurance breached no contractual duty owed to CCG.

20. Nemeth breached no contractual duty owed to CCG.

21. The Court finds that the Plaintiff has failed to carry its burden of proof showing that Connors, CCG, or Linda Connors committed theft as defined in Ind.Code § 35–43–4–2 (Burns Supp.1992).

22. The Court finds that the Plaintiff has failed to carry its burden of proof showing that Connors, CCG, and Linda Connors committed criminal conversion as defined in Ind. Code § 35–43–4–3 (Burns 1985).

23. The Court finds that the Plaintiff has failed to carry its burden of proof showing that Connors, CCG, or Linda Connors committed forgery as defined in Ind.Code § 35–43–5–2 (Burns 1985).

24. The Court finds that the Plaintiff has failed to carry its burden of proof showing that Connors, CCG, or Linda Connors committed deception as defined in Ind.Code § 35–43–5–3 (Burns Supp.1992).

25. The law and facts are with the Defendants as to the Second Amended Complaint, and against the Plaintiff with respect to liability.

26. The law and facts are with the Counterclaim Defendant and Third–Party Defendant as to the Counterclaim and Third–Party Complaint, with the exception of the claims requesting an accounting and the appointment of a receiver, which are moot.

27. A trial shall now go forward to determine the profits of all projects in which Connors and CCG collaborated with Nemeth and Western Assurance by contributing services, funds, or goods, together with the amount received by each of the parties and the amount to be paid, if any, by one to another, as well as the distribution of the amount in the Court's escrow fund.

## CONCLUSION

For the foregoing reasons, the Court hereby denies all claims in the Second Amended Complaint, Counterclaim, and Third–Party Complaint. Connors and CCG are entitled to fifty percent (50%) of the *profits* from all projects on which they collaborated with Nemeth and Western Assurance by contributing services, funds, or goods.

It is so ORDERED.

## PARTIAL JUDGMENT

In accord with the Court's entry in the above named action, the Court hereby denies all claims in the Second Amended Complaint, Counterclaim, and Third–Party Complaint. Connors and CCG are entitled to fifty percent (50%) of the *profits* from all projects on which they collaborated with Nemeth and Western Assurance by contributing services, funds, or goods.

It is so ORDERED.